UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.    CASE NO. 8:25-cr-530-CEH-LSG

CHAM LI

### UNITED STATES' MOTION TO REVOKE ORDER OF RELEASE

Pursuant to 18 U.S.C. § 3145(a)(1), the United States moves to revoke the release order of the Northern District of California Magistrate Judge Kandis A. Westmore permitting the release of Cham Li ("Li"). There is no condition or combination of conditions that will assure the safety of the community and Li's appearance in future court proceedings; he must be detained.

Title 18 United States Code, Section 3145(a)(1) provides that, "[i]f a person is ordered released by a magistrate judge," "the attorney for the Government may file, with the court having original jurisdiction of the offense, a motion for revocation of the order or amendment of the conditions of release." The District Court judges review the United States' detention request de novo. *United States v. Hurtado*, 779 F.2d 1467, 1471-1472 (11th Cir. 1985).

This Court has "original jurisdiction over the offense" within the meaning of § 3145(a)(1), and therefore has the authority to revoke the Magistrate Judge's out-of-district order. *See United States v. Torres*, 86 F.3d 1020 (11th Cir. 1996); *see also United States v. El Edwy*, 272 F.3d 139, 153 (2d Cir. 2001).

## BACKGROUND

On November 13, 2025, Li and three co-defendants, Hon Ning Ho, Jing Chen and Brian Curtis Raymond, were charged by indictment in the Middle District of Florida with conspiracy to violate and violations of the Export Control Reform Act, in violation of 50 U.S.C. § 4819, smuggling, in violation of 18 U.S.C. § 554, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(2).

On November 19, 2025, in the Middle District of Florida, the Honorable Amanda S. Sansone detained two Tampa-based defendants, Ho and Chen. In the detention orders, Judge Sansone specifically referenced the national security threat posed by the "extremely serious allegations" of sending powerful Graphics Processing Units ("GPUs") with "immense processing power" to China in violation of export control laws. Docs. 25 at 4 (Ho), 26 at 4 (Chen). As a basis for the detention, Judge Sansone also relied upon the fact the evidence against both Ho and Chen was strong, both were subject to a lengthy period of incarceration, if convicted; both had significant family and strong ties outside the United States. Docs. 25 at 3. (Ho); 26 at 3 (Chen). Ho also lacked stable employment and had previously failed to appear in court as ordered. Doc. 25 at 3. Chen lacked legal status in the U.S. and would be subject to removal/deportation upon release from prison. Doc. 26 at 3. Included in her reasons for detaining Ho and Chen, Judge Sansone stated: "If he flees to China, the United States will not be able to extradite him back to the United States." Docs. 25 at 4 (Ho); 26 at 4 (Chen).

Also on November 19, 2025, Raymond, a U.S. citizen with overwhelming family and business ties to the United States, made his initial appearance in the Northern District of Alabama. The United States agreed to his release on bond.

On November 20, 2025, Li made his initial appearance in the Northern District of California. The government moved for detention and the Court determined the United States was entitled to a detention hearing pursuant to 18 U.S.C. § 3142(f)(2). The detention hearing was held on November 20 and continued to November 25 and December 2, 2025. Following the detention hearings, the Magistrate Judge issued an Order granting Li bond pending trial. Attachments A and B. The United States requested the Court stay the order of release until December 5, 2025, so the United States could file a motion to stay the release order. Doc. 38. On December 4, 2025, the Court granted the motion to stay and ordered the Government to file its memorandum in support of vacating the order of release and detain the defendant pre-trial by December 8, 2025. Doc. 39.

## ARGUMENT

A court having original jurisdiction over an offense shall review a release order issued in another district upon a motion from an attorney for the United States. 18 U.S.C. § 3145(a)(1). "A district court considering appeals under the Bail Reform Act must conduct an independent review to determine whether the magistrate judge properly found that pretrial detention is necessary or release is appropriate." *United States v. Maxie*, 2024 WL 4369701, at *2 (M.D. Ala. Oct. 1, 2024) (citing *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988)).

On motion from the United States that the defendant poses a serious risk of flight, obstruction, or witness tampering, *see* 18 U.S.C. § 3142(f)(2)(A)-(B), a court shall hold a hearing to determine if there is a condition or combination of conditions that will reasonably assure the safety of any other person and the community. The burden of proof as to risk of flight is a preponderance of the evidence and the burden as to dangerousness is clear and convincing evidence. 18 U.S.C. § 3142(f); *see United States v. Quartermaine*, 913 F.2d 910, 915 (11th Cir. 1990).[1] A "'finding of either danger to the community or risk of flight will be sufficient to detain the defendant pending trial.'" *King*, 849 F.2d at 488 (quoting *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985)).

The factors to consider are (1) the nature and circumstances of the charged

---

[1] In *King*, the Eleventh Circuit observed that the term "dangerousness" as used in the Bail Reform Act of 1984 is much broader than that term is understood in everyday parlance. *Id.* at 487 n.2. The Court focused on the report of the Senate Judiciary Committee in delineating the types of conduct which Congress viewed as dangerous:

> The concept of defendant dangerousness is described throughout this chapter by the term "safety of any other person or the community." The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence. This principle was recently endorsed in *United States v. Provenzano and Andretta* [605 F.2d 85 (3rd Cir.1979)], in which it was held that the concept of "danger" as used in current 18 U.S.C. § 3148 extended to non-physical harms such as corrupting a union.

*King*, 849 F.2d at 487 n.2. (citing Report of the Senate Committee on the Judiciary, S. Rep. No. 98-225, 98th Cong., 2d Sess. (1984) U.S. Code Cong. & Admin. News 3182, 3195-96).

offense; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community the defendant's release poses. 18 U.S.C. § 3142(g).

In the instant case, Magistrate Judge Westmore's release order missed the mark as to Li's risk of flight as well as the serious national security implications involved in smuggling NVIDIA state-of-the-art GPUs to the People's Republic of China (PRC).  The United States urges the Court to adopt and apply Judge Sansone's reasoning to defendant Li because, as set forth below, Li presents the same, if not greater, flight risk as Ho or Chen with the same national security concerns based upon the charged conduct.

1. **Export Control Reform Act violations**

Since 2022, in the interests of United States national security, exporting NVIDIA GPUs to the PRC, specifically A100 and H200 models, required a license. In the current case, Li, Hon Ning Ho, Brian Curtis Raymond, and Jing Chen conspired to illegally export advanced NVIDIA GPUs to the PRC through Malaysia and Thailand.  In texts to Ho, Li openly discussed his father's connections to the Chinese Communist Party (CCP) and how the CCP has ways to import export-controlled GPUs from the United States into China.

Li and Ho formed Janford Realtor, LLC in Tampa, Florida despite the fact neither Li nor Ho had a real estate license and Janford was never involved in real estate transactions.  Li and his co-conspirators used Janford as a front company to purchase NVIDIA GPUs to give the appearance the GPUs were being purchased by

5

a U.S. company.   Upon receipt of the NVIDIA GPUs, Chinese co-conspirators would wire the funds to purchase the GPUs to Ho or Raymond.

In total, the co-conspirators received more than $3.89 million from Chinese co-conspirators through Bank of America to purchase NVIDIA GPUs.   In addition, an initial wire transfer of approximately $230,000 was frozen and returned to the Chinese senders by Grow Financial on the basis of suspected fraud or money laundering.

Upon receipt of payment from China, Ho, Li, Chen, and Raymond exported or attempted to export NVIDIA GPUs to China.   In total, there were two successful exportations and two unsuccessful exportations.

The first successful export occurred between October and December of 2024. Janford exported 150 NVIDIA A100 GPUs from the United States to the PRC, transshipped through Malaysia. The second export occurred in January of 2025, when Janford exported 250 NVIDIA A100 GPUs from the United States to the PRC through Malaysia.

In March 2025, Janford and Bitworks attempted to export 10 Hewlett Packard Enterprises supercomputers containing NVIDIA H100 GPUs to the PRC, transshipped through Thailand.   The fourth attempted export occurred in January and July 2025, when the Janford and Bitworks attempted to export 50 NVIDIA H200 GPUs from the United States to the PRC, transshipped through Thailand. These GPUs were seized by United States federal agents before they could be exported.

1. The nature and circumstances of the charges

The Export Control Reform Act (ECRA) is designed to restrict the distribution of NVIDIA GPUs to foreign adversaries due to national security and geopolitical concerns by requiring a license to export NVIDIA GPUs to the PRC, among other nations.   The immense processing power of NVIDIA's GPUs provide state-of-the-art capacity for developing large-scale Artificial Intelligence (AI) models, used in military, surveillance and cybersecurity applications.   NVIDIA's GPUs have the capability to accelerate AI and high-performance computing and constitute a serious threat to the national security of the United States. Indeed, as briefly explained above, NVIDIA's top-of-the-line GPUs have the potential to enhance China's military capabilities, provide them with the opportunity to build training and inference of massive models (including those used in autonomous weapons, surveillance, and cyberwarfare), support authoritarian surveillance systems, and be weaponized to create deepfakes, fake news, or synthetic media for disinformation campaigns.   Accordingly, the danger presented in the charged offenses here, export violations and the conspiracy to do the same, is not simply a danger to the community but the entire nation.

When the scheme to smuggle NVIDIA GPUs into China was being developed, Li boasted about his father's connections to the CCP and his father's ability to procure products on behalf of the CCP.   Li specifically told Ho that his father would introduce Li directly to a Chinese procurement agent to discuss GPU

7

pricing.  Li is the key person in the export conspiracy and export violations to render this potential national kinetic danger a reality.

Simply put, the nature and circumstances of the crimes charged weigh heavily in favor of detention.  As previously noted, Judge Sansone specifically referenced the national security threat posed by the "extremely serious allegations" of sending powerful Graphics Processing Units ("GPUs") with "immense processing power" to China in violation of export control laws in detaining Ho and Chen. Docs. 25 at 4 (Ho), 26 at 4 (Chen).  The United States urges this Court to apply the same reasoning to Li.

### 2. Weight of the evidence

Again, one of Magistrate Judge Sansone's findings as to Ho and Chen was the weight of the evidence was strong.  Docs. 25 at 3. (Ho); 26 at 3 (Chen).  The same evidence relied upon by Judge Sansone in detaining Ho and Chen applies to Li.  However, Li also made post-*Miranda* admissions to federal agents after his arrest.  Li's admissions include his close association with his co-conspirators prior to and during the charged offenses as well as confirmation of his knowledge and participation in the charged export conspiracy and substantive offenses.  More significantly, Li's admissions expanded the scope of the conspiracy.

From 2007 to 2013, Li attended Hillsborough County Community College before attending and graduating from the University of South Florida.  Li acknowledged Ho is his best friend and he also knew Chen from his time in Tampa, Florida.  Li admitted his father is affiliated with the CCP.

Upon graduation, Li's father referred him to his friend, who Li calls Uncle Chien, to obtain his current job, which he has held since 2013. Li reported his father and Uncle Chien are business partners and that Chien may also be affiliated with the CCP. During the course of the conspiracy, Ho asked Li to find another exporter, which Li was able to obtain from a co-worker at his job.

Li admitted the goal was to procure GPUs for exportation to China, including customers directly linked to the CCP, such as Inspur, Tencent and Weibo. Li admitted signing the agreements to sell the GPUs to be smuggled into the PRC. Li was fully aware Ho was shipping the GPUs to China through third-party countries such as Malaysia, Singapore, Vietnam, Thailand, Japan or Korea. Li explained the GPUs would remain in the transit countries for a period of time before exporting them to China. Li understood the GPUs would be run on the internet to avoid detection by NVIDIA that the GPUs were operating in restricted countries. Li advised Bitworks was Janford's main supplier for GPUs, sourcing Janford with various GPU models over the last year and a half.

Li advised Ho found other GPU suppliers (Dell and Lenovo) as an option to dealing exclusively with Raymond and Bitworks. Li stated he and Ho changed Janford's name to Janford AI Solutions because: 1) customers in China were skeptical why a realtor would be exporting GPUs, and 2) to pass compliance audits with NVIDIA and Dell. Li advised Ho also opened Shinka AI Motor as a subsidiary of Janford in an effort further distance the Janford name from the export violation scheme. Li also admitting signing a $7.9 million contract for Dell GPUs

9

to go to Taiwan.

Li had asked Ho if they should stop exporting GPUs to China after law enforcement came to Ho's house and Ho had his phones confiscated at the border. Ho told Li there were ways to get around the export restrictions. Li admitted his fiancé asked him to stop his participation in the illegal exportation scheme. However, Li continued in the illegal scheme as recently as a week prior to his arrest.

The breath and scope of Li's admissions clearly detail an expansive operation far exceeding the export violations detailed in the current Indictment. Li is the leader of the illegal exportation scheme who has the CCP connections to obtain customers in China for GPUs. With Li's post-*Miranda* statements, the evidence against Li is far more compelling than the evidence Judge Sansone found sufficient to detain Ho and Chen. While the weight of the evidence is not presumptive, it can be a factor weighing against release. *United States v. Fishenko*, 12-CR-626, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013) (Johnson, J.)

### 3. Potential Deportation of Li upon conviction

Given the strength of the evidence against Li, a conviction is a realistic possibility if not a probability. The consequences of a felony conviction would result in Li's deportation to China upon completion of his sentence. The sentencing guidelines for Li would foreseeably include a role enhancement, raising his advisory guideline range to 235-293 months. While Courts have considered deportation in the event of a conviction, standing alone, an insufficient basis for pre-trial detention, it would remain appropriate to factor into the detention issue calculus. Indeed,

Eleventh Circuit precedent is consistent that while an immigration detainer does not create a presumption of detention, but existence of one can still be considered as a factor in a court's detention decision. *See United States v. Garcia-Chagala*, 2017 WL 6535198, at *2 (M.D. Fla. Dec. 21, 2017); *see also United States v. Alverez-Lopez*, 2014 WL 2563646, at *4 (M.D. Fla. June 6, 2014); *United States v. Al'Sagga*, 2014 WL 252035, at *3 (S.D. Fla. Jan. 7, 2014) ("although not presumptively determinative, the fact that a defendant has an ICE detainer is also a factor to consider when evaluating the appropriateness of the pretrial detention."). While no detainer has been lodged against Li, a Legal Permanent Resident, that status could be revoked and a detainer lodged upon conviction. The Court can, and should, consider the strength of the evidence against Li in determining to what degree, if any, the potential for deportation following a lengthy prison sentence would serve as an incentive to flee upon release. *United States v. Sabhnani*, 493 F.3d 63, 66-67 (2nd Cir. 2007).

It is the Government's position even with the most stringent pretrial measures aside from detention, there still exists a risk of flight and danger to the community/nation. "Neither electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee." *United States v. Megahed*, 519 F. Supp. 2d 1236, 1244 (M.D. Fla. 2007) (Merryday, J.) (citing *United States v. Benevolence Int'l Found., Inc.*, 222 F. Supp. 2d 1005, 1007 (N.D. Ill. 2002)). "Even attentive and persistent monitoring of personnel of Pretrial Services leaves the possibility of some hours' delay in both notifying law enforcement of a

releasee's departure and beginning an effective search with the aid of a warrant and other essential aids to investigation and pursuit." *Megahed*, 519 F. Supp. 2d at 1244.

### 4. Significant ties to China and foreign travel

Li is a native of China having been born in Hong Kong. His father lives in China and his mother in Hong Kong. Li has no siblings. Recent foreign travel on his Hong Kong passport included trips to Mexico in December 2024, Japan and China in October 2024 and Canada in 2023. Judge Sansone cited similar family or other ties outside the United States as a reason for ordering Ho and Cen detained. Docs. 25 at 3 (Ho); 26 at 3 (Chen). A similar finding is appropriate for Li.

### 5. Flight to China would insolate Li from extradition

Judge Sansone found an additional factor warranting detention was if Ho and Chen fled to China the United States would not be able to extradite them back to the United States. Docs. 25 at 4 (Ho); 26 at 4 (Chen). This factor equally applies to Li as another factor warranting pre-trial detention.

## SUMMARY AND CONCLUSION

The factors weighing in favor of detention are the extremely serious charges implicating national security, strength of the evidence with a lengthy sentence upon conviction and deportation upon release, coupled with the inability to extradite Li should he flee to China upon pre-trial release.

For Li, there is virtually no incentive to remain in the United States to face these charges, but every incentive to flee to safe haven, China, should he be granted pre-trial release.  Nothing short of pretrial detention is a suitable option.  Given the factors presented, particularly relative to co-defendants Ho and Chen, Li must be detained.

The United States' motion should be granted.  Magistrate Judge Westmore's order of release should be revoked and Li detained pending trial.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: */s/ Joseph K. Ruddy*
JOSEPH K. RUDDY
Assistant United States Attorney
USAO No. 037
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:   (813) 274-6358
E-mail: joseph.ruddy@usdoj.gov

U.S. v. Cham Li Case No. 8:25-cr-530-CEH-LSG

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

> Defense Counsel of Record

> /s/ *Joseph K. Ruddy*
> JOSEPH K. RUDDY
> Assistant United States Attorney
> USAO No. 037
> 400 N. Tampa Street, Suite 3200
> Tampa, Florida 33602-4798
> Telephone:   (813) 274-6000
> Facsimile:     (813) 274-6358
> E-mail: joseph.ruddy@usdoj.gov

14