```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3      Before The Honorable Kandis A. Westmore, Magistrate Judge

 4

 5  UNITED STATES OF AMERICA,      )
                                   )
 6            Plaintiff,           )
                                   )
 7  vs.                            )  No. 4:25-MJ-71375-MAG-1
                                   )
 8  CHAM LI,                       )
                                   )
 9            Defendant.           )
    _____)
10
                                     Oakland, California
11                                   Thursday, November 20, 2025

12
    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13           RECORDING 10:54 - 11:32 = 38 MINUTES

14  APPEARANCES:

15  For Plaintiff:
                                United States Department of
16                                 Justice
                                United States Attorneys Office
17                              450 Golden Gate Avenue
                                11th Floor
18                              San Francisco, California
                                   94102
19                          BY:  NOAH STERN, ESQ.

20  For Defendant:
                                Federal Public Defender
21                              1301 Clay Street
                                Suite 1350N
22                              Oakland, California 94612
                            BY:  KAITLYN FRYZEK, ESQ.
23
    Transcribed by:             Echo Reporting, Inc.
24                              Contracted Court Reporter/
                                Transcriber
25                              echoreporting@yahoo.com
```

*Echo Reporting, Inc.*

2

<u>Thursday, November 20, 2025</u>                              <u>10:54 a.m.</u>

P-R-O-C-E-E-D-I-N-G-S

--oOo--

THE CLERK:  Calling the next matter on calendar, 4:25-MJ-71375-1, for U.S.A. versus Cham Li.

If I can have appearances, starting with counsel for the Government.

MR. STERN:  Good morning, your Honor.  Noah Stern on behalf of the United States.

THE COURT:  Good morning.

MS. FRYZEK:  Good morning, your Honor.  Kaitlyn Fryzek with the Federal Defenders Office.  I am here with Mr. Li who is present in custody.

THE COURT:  Okay.  Good morning.  Good morning, Mr. Li.

OFFICER MENDOZA:  Good morning, your Honor.  Ana Mendoza for Pretrial Services.

THE COURT:  Good morning.

(Pause.)

THE COURT:  Okay.  All right.  So, looks like, Mr. Li, you are here because a grand jury in the Middle District of Florida returned an indictment against you charging you with violations of federal law.

So, today, I will read you your constitutional rights. I will make sure the charges filed against you as well as

3

1  the maximum penalties for the charges are explained to you.

2  And because you are charged with offenses that were

3  allegedly committed in another district, there are a couple

4  of matters that I will explain to you about that as well.

5      We will also address the question of whether you will

6  be released or detained while you await trial on the charges

7  and set your future court date in this case.

8      But, first, let me start by advising you that you have

9  the right to remain silent.  You do not have to answer any

10  questions or make any statements.  If you have already made

11  a statement, you're not required to say any more, and if you

12  start to make a statement, you may stop at any time.

13      You have the right to consult with an attorney before

14  any questioning and have an attorney present during any

15  questioning.  If you do make a statement, it may be used

16  against you.

17      You have the right to an attorney.  Your attorney will

18  consult with you and represent you through all stages of

19  your case both in and out of court.

20      If you can't afford to hire your own attorney, the

21  Court can appoint one for you.

22      So, we do have Ms. Fryzek here from the Public

23  Defenders Office.  Are you seeking appointment?

24          MS. FRYZEK:  I am, your Honor.  I will pass

25  forward a financial affidavit.

4

1        THE COURT:  Okay.

2    (Pause.)

3        THE COURT:  I have the financial affidavit for Mr.

4    Li.

5    (Pause.)

6        THE COURT:  Ms. Fryzek, is it your opinion that

7    he's qualified for appointment of counsel?

8        MS. FRYZEK:  He does tell counsel that he does not

9    have the ability to pay for a lawyer.  And given that this

10   is a Rule 5 situation and he really does need counsel today

11   and was not able to arrange for anyone to be here today --

12       THE COURT:  Um-hmm.

13       MS. FRYZEK:  -- I would ask to be appointed for

14   the Rule 5 proceedings.  I -- I do understand his financial

15   situation is different than the average Federal Public

16   Defender Client.

17       THE COURT:  Right.  I mean, he has assets, and I

18   guess they're in Florida?

19       MS. FRYZEK:  I believe -- so, he owns a home in

20   San Leandro.

21       THE COURT:  Oh, it's in San Leandro?

22       MS. FRYZEK:  Yes.

23       THE COURT:  Okay.  Yes.  So, he has significant

24   equity in that property, and he has other assets.  And, so,

25   he definitely would at the very least have to contribute to

5

1 the cost of his representation.  So, I'm not really finding

2 him qualified at this point for -- for appointment, but I

3 can agree to have sort of just temporary appointment for the

4 purposes of the Rule 5 proceedings.  But then, beyond that,

5 he's going to need to hire counsel.

6          MS. FRYZEK:  Understood, your Honor.

7          THE COURT:  I guess my finding is really just he's

8 not really -- he's not qualified for appointment of counsel,

9 but I'm allowing it for the limited purposes of the Rule 5

10 appearance.

11          MS. FRYZEK:  Yes, your Honor.

12          THE COURT:  I mean, it's still -- yes, um-hmm.

13     Okay.  So, Mr. Li, we'll have Ms. Fryzek stand up and

14 represent you this morning, but you will have to look for

15 and hire an attorney.  And you can talk to Ms. Fryzek about

16 that.

17     All right.  Okay.  And, so, Ms. Fryzek, do you and Mr.

18 Li have a copy of the Rule 5 documents and the indictment

19 out of the Middle District of Florida?

20          MS. FRYZEK:  Yes, your Honor.

21          THE COURT:  Okay.  Would the Government please

22 summarize the charges and the maximum penalties?

23          MR. STERN:  Yes, your Honor.  Mr. Li is charged

24 with four counts in the indictment pending in the Middle

25 District of Florida.

6

1        In Count 1, he's charged with conspiracy to violate the

2   Export Control Reform Act, in violation of Title 50, United

3   States Code Section 4819.

4        And in Count 2, he's charged with a violation of the

5   Export Control Reform Act, in violation of the same statute.

6        The maximum penalties for Counts 1 and 2 are 20 years

7   in prison, a $1 million fine, three years of supervised

8   release, a mandatory $100 special assessment per count,

9   potential deportation, and forfeiture.

10       In Count 6, Mr. Li is charged with smuggling goods from

11  the United States, in violation of Title 18 United States

12  Code Section 554.

13       The maximum penalties for Count 6 are 10 years in

14  prison, a $250,000 fine, three years of supervised release,

15  a $100 mandatory special assessment, potential deportation,

16  and forfeiture.

17       Finally, Mr. Li is charged in Count 9 with conspiracy

18  to commit money laundering, in violation of Title 18 United

19  States Code Section 1956(h).

20       The maximum penalties for that count are 20 years in

21  prison, a $500,000 fine, three years of supervised release,

22  a mandatory $100 special assessment, potential deportation,

23  and forfeiture.

24           THE COURT:  Okay.  Thank you.

25       So, Mr. Li, those are the charges in the indictment and

7

1 the maximum penalties you face, not necessarily the actual

2 penalties you would receive if you were to be convicted.

3 But because you are charged with offenses that allegedly

4 were committed in another district, I need to advise you of

5 two matters that have to do with where your future

6 proceedings will take place.

7     First, because you are -- you have been arrested here,

8 it is possible to transfer your case to this District under

9 certain conditions.  The first is that you would have to

10 waive your right to trial in the Middle District of Florida,

11 and you'd have to plead guilty here.

12     Also, the U.S. Attorneys from the District -- this

13 District and from the charging district would have to agree

14 to such a transfer.  That's pursuant to Rule 20.

15     Mr. Stern, do you know if there's any information or

16 status regarding Rule 20 proceedings?

17         MR. STERN:  I don't believe that would happen, but

18 we haven't specifically discussed it.

19         THE COURT:  Okay.  And, Mr. Li, I also want to

20 advise you of your right to an identity hearing before a

21 judge can transfer your case back to the Middle District of

22 Florida.

23     Before you can be transferred or what we call removed

24 to the other District, you have a right to a removal hearing

25 in this Court to determine two things, one, whether there is

8

1  a valid charging document like the indictment and, two,

2  whether you actually are the person charged in that

3  document.

4      And if the answer is yes, then this Court must remove

5  you to the Middle District of Florida, and the purpose of

6  having the removal hearing is not to determine whether you

7  are guilty of the charges.

8      You also have the right to waive the removal hearing,

9  in which case you would simply be transferred as soon as

10  possible to the Middle District of Florida so that you can

11  deal with the charges there.

12      Ms. Fryzek, have you had an opportunity to consult with

13  Mr. Li about whether to hold or waive a removal hearing?

14          MS. FRYZEK:  We would like to be heard on -- on

15  the removal issue.

16          THE COURT:  Okay.  How would -- would you like to

17  set a removal hearing separately or you want to be heard

18  now?

19          MS. FRYZEK:  I -- I'm asking to be heard now.  I

20  do understand the Government is intending to move for

21  detention.  So, I'd like to be heard on that issue.

22          THE COURT:  Okay.  Go ahead.

23          MS. FRYZEK:  Well, first, I think -- I'd like to

24  hear -- I'm assuming the Government is moving on the basis

25  of serious risk of flight, but I'd like to hear the

9

1  Government's basis.

2          THE COURT:  So, you want to address the detention

3  issue first --

4          MS. FRYZEK:  Yes.

5          THE COURT:  -- before dealing with the removal,

6  identity -- okay.  All right.  I don't know if the

7  Government's moving for detention yet, but what is the

8  Government's position on the question of detention or

9  release?

10         MR. STERN:  Your Honor, the Government moves for

11  detention pursuant to Title 18 United States Code Section

12  3142(f)(2)(A) on the basis that the Defendant is a serious

13  risk of flight.

14         THE COURT:  Okay.  And are you prepared to proffer

15  the basis for that motion?

16         MR. STERN:  Yes, your Honor.

17         THE COURT:  All right.  Go ahead.

18         MR. STERN:  Your Honor, Mr. Li is a serious risk

19  of flight.  He committed an extremely serious offense.  The

20  weight of the evidence is strong.  The potential jail he

21  faces is significant, and he has substantial ties to China,

22  and the crimes he's alleged to have committed were for the

23  benefit of China, a country that does not extradite.

24      Based on that, he's a serious risk of flight that

25  requires detention.  And, so, I want to start with the

1 nature of the offense.

2     So, this was an extremely serious offense.  He's

3 charged with violating export controls by engaging in a

4 conspiracy to export advanced Nvidia chips to China, and I

5 think to kind of expand on how that's serious, I think I

6 need to talk a little bit about what these chips do, and the

7 chips that he is charged with conspiring to export are

8 Nvidia A100 and H200 chips.

9          THE COURT:  Nvidia A100 and --

10          MR. STERN:  H200.

11          THE COURT:  -- H200 chips.  Okay.

12          MR. STERN:  And, so, these are -- at the time that

13 these were being exported, these were Nvidia's most advanced

14 chips.  They have immense processing power that makes them

15 ideal for developing large scale AI models, including those

16 that are used in the military surveillance and cyber

17 security applications.

18          THE COURT:  Um-hmm.

19          MR. STERN:  And the concern is that these chips

20 could be used to enhance military automated weapons and have

21 the capability to support authoritarian surveillance

22 systems.  And, for those reasons, the export of those chips

23 is controlled.

24     So, for example, the GPUs are what power AI models

25 that, you know, we hear about every day today.  And

1  countries like China may want to use these chips to develop

2  advanced language models for propaganda, surveillance and

3  cyber operations, including that these chips are used to

4  create things like deep fakes, fake news and synthetic media

5  for disinformation campaigns.

6          THE COURT:  Um-hmm.

7          MR. STERN:  The GPUs can also be used for military

8  and surveillance applications.  They have the ability to

9  process massive data sets quickly, and they can be used for

10  things like satellite image analysis, facial recognition at

11  scale, and I think this already, but autonomous weapons

12  systems.

13      And then the -- the final thing I'll mention is that

14  these GPUs' processing power also makes them ideal for

15  breaking encryption, for doing things like simulating cyber

16  attacks and for building AI intrusion systems.

17      And, for that reason, their export is controlled to

18  certain countries, and a license is required in order to

19  export them to those countries.

20          THE COURT:  Um-mm.

21          MR. STERN:  My understanding is that the United

22  States does not grant those licenses to export these chips

23  to China.

24      And, so, the manner that -- that Mr. Li committed these

25  crimes also shows that he committed these crimes for the

12

1  benefit of China and that he has close connections to China.

2         So, the conspiracy basically worked as followed

3  (sic).  Mr. -- Mr. Li worked with Mr. Ho (phonetic) to found

4  a company called Janford Realtor or Relator, and that

5  company was never involved in any real estate transactions.

6  Instead, Mr. Ho and Mr. Li used that company as a front to

7  illegally export the Nvidia GPUs to the PRC.

8      And at the outset of the scheme, it was -- it was Mr.

9  Li who kind of boasted about his father's connections in

10  China and kind of how this -- how this process could work

11  because his --

12         THE COURT:  It was Mr. Li who boasted you said?

13         MR. STERN:  Yes.  Mr. Li would talk about how his

14  father had engaged in similar business on behalf of the

15  Chinese Communist Party.  So, he -- Mr. Li explained to Mr.

16  Ho that the Chinese Communist Party would assign procurement

17  to local Chinese governments who would then hire Mr. Li's

18  father to procure the products.  And Mr. Li told Mr. Ho that

19  his father would introduce Mr. Li directly to the Chinese

20  government procurement agent to discuss pricing, and that's

21  kind of how this got started.

22      And, then, so -- and then the scheme kind of proceeded

23  where Janford, the company they set up, would receive

24  payment from China, purchase Nvidia chips from resellers

25  here in the United States, and the coconspirators would

13

1  claim that Janford was the end user of those Nvidia chips,

2  but in reality, they would export those GPUs through a third

3  country such as Malaysia and then re -- redirect them to

4  China.

5      So, in total, the conspirators received more than $3.8

6  million to purchase these GPUs and received at least 400

7  Nvidia GPUs.

8          THE COURT:  From China or --

9          MR. STERN:  I don't know exactly how many of the

10 GPUs ended up in China.

11         THE COURT:  Um-hmm.

12         MR. STERN:  I know the indictment discusses four

13 different shipments.  What I have here from my information

14 is that they had purchased 400 Nvidia GPUs.  I don't know --

15         THE COURT:  And is that where the $3.8 million

16 came from?

17         MR. STERN:  The $3.8 million came directly from

18 China.

19         THE COURT:  Okay.

20         MR. STERN:  Yes.  So --

21         THE COURT:  Okay.

22         MR. STERN:  -- it is a very -- a very serious

23 offense, and -- and I note the weight of the evidence is --

24 is the least important factor, but I do think that it is

25 important here given that I think it plays into the

14

1   incentive to flee.

2           THE COURT:  Um-hmm.

3           MR. STERN:  And, so, the weight of the evidence is

4   very strong here.  And, so, the evidence includes text

5   messages that the Government obtained between Li and the

6   other coconspirators, demonstrating that they -- that they

7   knew that the GPUs were export controlled and that they

8   could not be -- be sent to China.  And Mr. Li sent at least

9   a few text messages to the other coconspirators, including

10  things like news articles and other things, demonstrating

11  his knowledge that a license would be required to export

12  these chips to China.

13      And Li also told Mr. Ho about a Chinese customer who

14  was going to send specifications for the products needed.

15  He confirmed -- Mr. Li confirmed that the customer in China

16  knew that these products were banned in China but explained

17  that his father, who had ties to the Chinese Communist

18  Party, has ways to -- to import them.

19      And then --

20          THE COURT:  So, they were controlled here and also

21  illegal in China?

22          MR. STERN:  Not illegal --

23          THE COURT:  Or banned in China?

24          MR. STERN:  Not illegal in China.  It was banned

25  -- well --

15

1        THE COURT:  Sounds like that was what you were

2   saying, the person in China --

3        MR. STERN:  I -- this -- this information is

4   information that was provided to me by the AUSAs in the

5   Middle District of Florida --

6        THE COURT:  Okay.

7        MR. STERN:  -- and by the agents.  I would -- I

8   would think that that means that banned to send to China,

9   but I have --

10        THE COURT:  Okay.

11        MR. STERN:  I'm not 100 percent sure.  And, so,

12   Mr. Li, you know, he participated in this conspiracy both by

13   -- by telling Mr. Ho about how these exports could be done.

14   He helped set up the company, Janford, at which he was a

15   manager, and that was the company that was used to receive

16   the money and to send the chips to China.

17        And he also would review the technical specs and

18   contracts for -- for shipments that would be directed to

19   China.

20        And, fourth, my understanding is that Mr. Li was

21   interviewed by agents yesterday and did, you know, admit to

22   various facts that inculpate him in the charges.

23        And, so, you know, I think the weight of the evidence

24   plays in with what the potential penalties are here, and he

25   is facing both significant prison time and the loss of his

16

permanent resident status.  he is a citizen of Hong Kong,
but he is a lawful permanent residence in the United States,
and I'm told that the Guidelines calculation for the money
laundering allegations are 151 to 188 months in prison.  So,
he is facing, you know, over 10 years in prison on charges
where the weight of the evidence is strong and which he's
very likely to be deported after any prison sentence.

     Mr. Li also has some means to flee.  My understanding
is that he has a steady job at which he makes a salary of
approximately $70,000 a year, and he has approximately
$900,000 in home equity.

          THE COURT:  I think it's more than that.

          MR. STERN:  Okay.

          THE COURT:  Just based on what I've read.  So,
yes.

          MR. STERN:  And, so -- so, he has the means to
flee to China.  He also has significant ties to China.  As I
mentioned, he's a citizen of Hong Kong.  China does not
expedite its citizens to the United States.  So, if he does
flee to China, the United States will be unable to prosecute
him in this case.

          THE COURT:  Okay.

          MR. STERN:  He has -- my understanding is that he
has family in China.  His father is in China.  His -- his
father helps the Chinese Communist Party and local

17

1 governments procure these Nvidia chips.  He -- in text

2 messages, he kind of referred -- he made references to kind

3 of his familiarity with how the Chinese Communist Party

4 operates, including there was a discussion of having to wait

5 two weeks and nothing happening with respect to finding a

6 buyer for these chips in China, and Mr. Li said that was

7 typical CCP operations.

8          THE COURT:  Um-hmm.

9          MR. STERN:  And -- and then Mr. -- Mr. Li told Mr.

10 -- when Mr. Ho was not satisfied with that, Mr. Li told Mr.

11 Ho, Yeah, that's why this time we play it different.  I'll

12 give you all the info.

13      So, and one other point to make is that, according to

14 the agents, Mr. Li obtained his current -- he has a job here

15 that's for a hardware distribution company, and Mr. Li

16 apparently obtained that job through a connection with

17 another individual who -- who lives in China and I believe

18 is on the board of that company.  So, he has significant

19 ties to China.

20      I'm not -- there's been on prebail report.  I'm not

21 aware of what his ties are to the United States other than

22 that he is a -- a Green Card holder and he does own a home

23 here, lives in San Leandro.

24      He also has significant overseas travel.  He has -- he

25 took month-long trips or more than a month-long trips to

18

1  Hong Kong in 2019 and 2017 and 2011 and in 2009.  And he

2  also took month-long trips to Taiwan in 2024 and 2015.

3          THE COURT:  Um-hmm.

4          MR. STERN:  So, with -- with all that, I mean, I

5  would conclude -- conclude to say that he's a serious risk

6  of flight, and -- and I would also just here note that his

7  three -- the three charged coconspirators --

8          THE COURT:  Um-hmm.

9          MR. STERN:  -- appeared yesterday.  Two of

10 those --

11         THE COURT:  Where did they appear?

12         MR. STERN:  So, two appeared in the Middle

13 District of Florida, and one appeared I believe in Alabama.

14         THE COURT:  Okay.

15         MR. STERN:  And the -- the Government sought

16 detention for the two that appeared in Florida, of Mr. Ho,

17 who -- who is alleged to be kind of the most culpable party,

18 the -- the one who is really, to the extent there was a

19 leader, organizer, I believe that it would be him.  He is a

20 U.S. citizen.  He was ordered detained.  And then Mr. Chan

21 also appeared in the Middle District of Florida, and he was

22 also detained.  He is a Hong Kong citizen on a student visa.

23     The third Defendant the Government did not seek

24 detention for.  He is a U.S. citizen who worked at one of

25 the resellers who were providing the Nvidia chips.  He, as

19

1  -- as far as I know, he has no foreign ties.  And, so, the

2  Government was satisfied that conditions could be crafted

3  that would ensure his appearance.

4          THE COURT:  Um-hmm.

5          MR. STERN:  So, in all, Mr. Li has significant

6  connections to China, and he committed these crimes in part

7  for the benefit of China.  He faces a significant prison

8  sentence, and the weight of the evidence is extremely

9  strong, making it highly likely that he'll -- that he will

10 serve the sentence if he does not flee.

11         THE COURT:  Um-hmm.

12         MR. STERN:  And Mr. Li is almost certain to be

13 deported after he serves his sentence, increasing his

14 incentive to flee.

15     And, finally, Mr. Li has the means and connections to

16 flee, and there are no set of conditions that could impose

17 his -- could ensure his appearance in this case.

18         THE COURT:  Okay.  And I'll hear from the

19 Defendant.

20         MS. FRYZEK:  Thank you, your Honor.

21     So, at this stage, we are addressing whether there was

22 a -- there's a serious risk of flight such that we should

23 hold a detention hearing.  And I think what's really

24 important about that is whether this is a serious risk of

25 flight or just a risk of flight, the average risk of flight

20

1  that any case presents.

2      And what I would really like to highlight is that Mr.

3  Li has a lot of connections, both to California and to the

4  Bay area.  He has been here since 2013, which is over 10

5  years.  He has a fiancee.  They are planning their wedding.

6  They live together in his home in San Leandro that he bought

7  in 2020 and has been paying the mortgage for.  He has a job

8  that he has been working.  It's a full-time job.  One

9  moment.

10      (Pause.)

11          MS. FRYZEK:  And he's been working in that job

12  since 2013.  The company has -- I'm sorry.  He's been

13  working a full-time job since 2013.  The company has changed

14  a few times, but he is somebody who has deep ties to this

15  area.  He does not have an incentive to leave.  His

16  incentive is to stay and get married to his fiancee who is a

17  U.S. citizen.  He is a Green Card holder.  He's had his

18  Green Card since 2019.

19      He has the ability to pay and get to Florida for his

20  hearing.  He also has significant family in Florida.  His

21  mother's side of the family lives in Florida.  And, frankly,

22  his travel history I think is fairly consistent with

23  somebody who has family living in another country.  The

24  Government raised travel dates every couple of years for

25  months, you know, having family abroad, going for longer

1 periods of time, going every couple of years.  I don't think

2 that's necessarily indicative that he is any kind of flight

3 risk.  He -- as I'm hearing from Mr. Stern, I -- I don't

4 know the full situation, but it sounds like Mr. Li was

5 interviewed by the agents and admitted to certain things.  I

6 don't know the content of those, but that to me signals

7 someone who's not trying to run, who is here and seeking to

8 cooperate and will willingly go to Florida.  He has the

9 ability to pay for the flight to get there, and he was

10 actually supposed to go to Florida for a family wedding next

11 weekend I believe.

12     So, this is not somebody who presents a serious risk of

13 flight.  He wants to stay in this country.  He wants to get

14 his own citizenship.  He wants to be married, and he owns a

15 home here and has a full-time job.  It's hard to imagine

16 anybody who would have more connection here.

17     And, so, I think at this point, I don't think there's

18 enough to show he is a serious risk of flight such that he

19 -- such that a full detention hearing is warranted or that

20 he be detained while he is moved to Florida.

21     I understand the serious nature of these allegations.

22 It sounds as if he was not the ring leader or sort of

23 mastermind of this operation that, if I'm understanding

24 correctly, was Mr. Ho.  And, again, unlike Mr. Chan, who was

25 here on a student visa, Mr. Li is a Green Card holder.

1          THE COURT:  Okay.

2          MS. FRYZEK:  He tells me his fiancee also has his

3    passport, and he would be able to turn his passport in.

4          THE COURT:  All right.  Any more from the

5    Government?

6          MR. STERN:  Yes, your Honor.  So, the defense

7    counsel noted that he admitted to certain things.  I think

8    in some ways, that increases the risk of flight in the sense

9    that to the extent that it makes the punishment or the

10   weight of the evidence stronger and the likelihood that

11   he'll have to be deported after serving a lengthy prison

12   sentence anyways.  That's just going to increase the risk of

13   flight.  And I think, you know, the risk of flight really

14   increases once he's told of the maximum penalties and the

15   fact that he's facing over 10 years in jail and that the

16   evidence is so strong.

17       And, so, I think, you know, that really comes up kind

18   of after these admissions, and these admissions kind of --

19   kind of lead into increasing that incentive.  Comparing it

20   to other cases, the risk of flight is very serious here.

21   His father is in China.  His father works with the Chinese

22   Communist party.  He committed these crimes in part for the

23   benefit of China.  He is essentially a Chinese citizen, a

24   citizen of Hong Kong, but Hong Kong is part of China now.

25   And, so, you know, I think the circumstances here are -- are

23

1  substantial.  I -- I don't want to compare it to other --

2  all the other cases, but the -- the circumstances here are

3  very serious risk of flight.

4          THE COURT:  Okay.  So, while it is true that the

5  weight of the evidence is generally the least important

6  factor, it does go to risk of flight.  It is something that

7  the Court can consider as contributing to the risk of

8  flight, and it sounds like the evidence is pretty strong

9  here and that Mr. Li has made some admissions.  I'm not sure

10  what they were, but it sounds like the evidence is quite

11  strong, and now he does know what he's facing, and he does

12  know that his Green Card status could even be at risk if

13  he's convicted, and, you know, all of his plans that he had

14  for being here and getting married and all that would be

15  interrupted if he's convicted and he's sentenced, and if

16  he's sentenced in the way that the Government has described

17  he could potentially be sentenced, that certainly does

18  create a strong incentive to flee with a case pending

19  against him with these kinds of serious charges and maximum

20  penalties.

21      And, so, I think the Government has made a compelling

22  enough proffer today to warrant having a full bail study and

23  a detention hearing in this matter.  So, that's what I will

24  order if you would like to proceed that way, Ms. Fryzek.

25          MS. FRYZEK:  Yes, please, your Honor.  And I'm

24

1  wondering if the Court and counsel are available Tuesday,

2  the 25th for that purpose?

3          THE COURT:  25th?  I'm on duty all day.  So, I'll

4  be here.

5          MR. STERN:  That works for me, your Honor.

6          THE COURT:  Okay.  We'll put it on the 25th at

7  10:30 in this courtroom.  We'll get a full bail study from

8  Pretrial Services.

9      Regarding -- Ms. Fryzek, regarding removal and

10 identity, I mean, I'm assuming you're wanting to waive that

11 in order to have his detention hearing?

12         MS. FRYZEK:  Can we come back for a status on

13 those on Tuesday?

14         THE COURT:  Okay.

15         MS. FRYZEK:  I just haven't had a chance to

16 discuss that with Mr. Li.

17         THE COURT:  Okay.

18         MS. FRYZEK:  So, I just want to make sure.

19         THE COURT:  So, we'll do status regarding removal

20 hearing and detention hearing, but we'll have a detention

21 hearing.  So, we'll address the removal issue first.

22     And do you want him to be interviewed after court

23 today?

24         MS. FRYZEK:  Yes.

25         THE COURT:  Okay.  And Pretrial Services can do

25

1  that?

2           OFFICER MENDOZA:  Yes.

3           THE COURT:  Okay.

4           OFFICER MENDOZA:  Will you be available?  How do

5  you want to do that?

6           MS. FRYZEK:  I will be available at the end of

7  this calendar, whenever that is.

8           OFFICER MENDOZA:  Okay.

9           THE COURT:  Okay?

10          OFFICER MENDOZA:  Yeah, no, that's fine.  I just

11  -- I have a -- yes.

12          THE COURT:  It may be a long calendar.  Well, you

13  know, that's the way it's been going this month.  So --

14          MS. FRYZEK:  Okay.  Thank you.

15          THE COURT:  Hopefully not as long as some of the

16  other days.  Okay.  So, he will be interviewed with counsel

17  after court today.

18      Ms. Fryzek, I would say -- Ms. Fryzek, just please just

19  make sure you talk to him about the -- his need to find

20  counsel to --

21          MS. FRYZEK:  Yes.  We will discuss that as well.

22          THE COURT:  -- retain because he's -- you know,

23  it's sounding like he does have sufficient means to pay for

24  counsel.  He just needs to figure out how to make that --

25  whatever he has to do to make that happen.

26

1          MS. FRYZEK:  Yes.  And just for my clarification,

2 will the Court permit me to proceed on Tuesday as --

3          THE COURT:  Yes.

4          MS. FRYZEK:  -- his counsel?  Thank you.

5          THE COURT:  But I do need to -- I would like to

6 have an update from you on, you know, what's happening with

7 that, and I may make him contribute to the cost of your

8 representation.

9          MS. FRYZEK:  Understood.

10          THE COURT:  I probably -- it's not really may.  I

11 think I am going to make him contribute to the cost of your

12 representation.  But, ultimately, he does need to retain

13 counsel.

14          MS. FRYZEK:  Understood, your Honor.  We will

15 discuss that.

16          THE COURT:  Okay.  And, so, we will be back on the

17 25th, which is next Tuesday, at 10:30, for a detention

18 hearing.

19          THE CLERK:  Your Honor, DPP?

20          THE COURT:  I'm sorry?

21          THE CLERK:  DPP.

22          THE COURT:  Oh, yes.  Thank you.

23     Just pursuant to the Due Process Protection Act,

24 counsel for the Government is reminded of the Government's

25 disclosure obligations pursuant to <u>Brady v. Maryland</u> and its

27

1   progeny.  The failure to do so in a timely manner may result

2   in dismissal of the indictment, dismissal of individual

3   charges, exclusion of Government evidence or witnesses or

4   any other remedy that is just under the circumstances.

5            MR. STERN:  Thank you, your Honor.

6            THE COURT:  All right.  Thank you.  He's remanded

7   to the custody of the Marshals.

8        (Proceedings adjourned at 11:32 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28

1                    CERTIFICATE OF TRANSCRIBER

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17          Echo Reporting, Inc., Transcriber

18            Tuesday, December 9, 2025

19

20

21

22

23

24

25